## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Brownsville General Hospital, Inc., | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Workers' Compensation Appeal | : | |
| Board (Berish), | : | No. 1496 C.D. 2016 |
| Respondent | : | Submitted: February 17, 2017 |


BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE JOSEPH M. COSGROVE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                           FILED: May 23, 2017


Brownsville General Hospital and its workers' compensation carrier State Workers' Insurance Fund (collectively, Employer) petition this Court for review of the Workers' Compensation Appeal Board's (Board) August 17, 2016 order affirming the Workers' Compensation (WC) Judge's (WCJ) decision granting Patricia Berish's (Claimant) petition for review of medical treatment (Petition). Employer presents four issues for this Court's review: (1) whether the Board and the WCJ erred by failing to find that Claimant and her husband acted in bad faith; (2) whether the Board and the WCJ erred by finding that Claimant was entitled to a new wheelchair-accessible van; (3) whether the WCJ erred by finding Claimant's second wheelchair-accessible van (Van 2) was unreliable; and, (4) whether the WCJ issued a reasoned decision.  After review, we affirm.

On June 22, 2005, while working for Employer, Claimant sustained an injury when she was assisting a patient out of bed and into a chair.  Employer issued a

notice of compensation payable which described the injury as a low back sprain. Thereafter, Employer filed a petition for modification or suspension of WC benefits alleging that work was generally available to Claimant, but she had voluntarily withdrawn from the workforce (Suspension Petition). Claimant filed a petition for review of medical treatment alleging that she had developed paralysis as a result of the work injury and required subsequent surgical treatment (Review Petition). On July 30, 2012, the WCJ denied Employer's Suspension Petition and granted Claimant's Review Petition. The WCJ specifically found that Claimant's February 24, 2011 surgery and her subsequent paralysis were causally related to Claimant's June 22, 2005 work injury.

On April 3, 2013, Claimant filed the Petition, wherein she requested Employer to purchase a wheelchair-accessible van on the basis it is reasonable, necessary and causally related to Claimant's accepted work injury. Employer responded that it had already purchased a wheelchair-accessible van that met Claimant's needs and satisfied Employer's obligations under the WC Act (Act).[1] On July 30, 2014, Claimant passed away. Claimant's Counsel has asked that any recovery be paid to Claimant's husband.

During the course of the litigation, the parties submitted a written stipulation that: (1) this matter involves the Petition in which Claimant sought payment by Employer for a third wheelchair-accessible van (Van 3) she claimed was necessary for transportation due to her condition; (2) Employer denies that it is responsible for Van 3, as it purchased Van 2; (3) Van 3 was purchased by Claimant and her husband for $72,058.56; (4) Claimant and her husband sold Van 2 for $6,000.00; (5) Claimant and her husband sold Van 3 for $30,000.00; and (6) the amount in controversy is $36,058.56. *See* Reproduced Record (R.R.) at 311a.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

The WCJ held hearings on May 24, July 26 and November 1, 2013, February 24 and June 2, 2014 and June 19, 2015. On January 4, 2016, the WCJ granted the Petition. Employer appealed to the Board. On August 17, 2016, the Board affirmed the WCJ's decision. Employer appealed to this Court.[2]

Initially, our Supreme Court has held

> that the van, and not merely the wheelchair lift and modifications installed in the van, may qualify as an indispensable device necessary to accommodate this sort of catastrophic work injury, and thus, may fall within the definition of an orthopedic appliance. [The Court] also h[e]ld, however, that the extent of an employer's obligation in this regard will depend upon the specific facts of the case.

*Griffiths v. Workers' Comp. Appeal Bd. (Seven Stars Farm, Inc.),* 943 A.2d 242, 244 (Pa. 2008).

Employer first argues that the Board and the WCJ erred by failing to find that Claimant and her husband acted in bad faith because Claimant did not advise Employer of any problems she was having with Van 2, nor did she give Employer an opportunity to make any necessary repairs to Van 2. Claimant rejoins that Employer did not raise this issue before the WCJ or the Board, therefore, it is waived. *See Brewer v. Workers' Comp. Appeal Bd. (EZ Payroll & Staffing Solutions),* 63 A.3d 843, 847 (Pa. Cmwlth. 2013) ("[F]ailure to raise an issue before the factfinder or the Board waives the issue on appellate review.").

In its brief filed with the WCJ, Employer raised the issue of "[w]hether [E]mployer should be required to pay for [V]an []3 when [C]laimant gave [E]mployer no opportunity to fix [V]an []2." R.R. at 205a. In its Board Petition Summary,

---

[2] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

3

Employer included the issue of whether the WCJ erred by "failing to address [E]mployer's argument that [C]laimant failed to act reasonably when [she] did not advise [E]mployer of any problems with Van []2, and did not give [E]mployer an opportunity to make any necessary repairs to it." R.R. at 225a. Because Employer did not previously use the words "bad faith"[3], we will address the issue as it was originally raised, i.e., whether Claimant acted "reasonably" by not giving Employer an opportunity to repair Van 2 before purchasing Van 3.

Our decision in *Zuback v. Workers' Compensation Appeal Board (Paradise Valley Enterprise Lumber Co.),* 892 A.2d 41 (Pa. Cmwlth. 2006), is analogous to the case at bar. In *Zuback,* the employer installed stair glides in the claimant's home to allow the claimant to move between floors. More than 25 years after the employer initially installed the glides, the claimant filed a penalty petition against the employer alleging that the employer had failed to pay to have the glides repaired. The WCJ denied the claimant's petition, and the Board affirmed the WCJ's decision, reasoning that the employer was only required to make a one-time expenditure to modify the claimant's home, which it had done. This Court reversed, concluding:

> Claimant did not seek any additional modifications to his house, but only the replacement of the two stair glides. The stair glide, which operates much like a wheelchair, is clearly an 'orthopedic appliance.' Further, **this record reflects that [the insurance carrier] has provided [the c]laimant with numerous wheelchairs and replacement beds as a result of 'wear and tear.' Stair glides should receive the same treatment. 'In reviewing [WC] matters, we are also guided by the basic premise that [the Act] is remedial in nature and is intended to benefit workers, and therefore, the Act must be liberally**

---

[3] "'Bad faith,' as that term has been defined, is fraud, dishonesty, or corruption." *Springfield Twp. Bucks Cnty. Bd. of Supervisors v. Gonzalez,* 632 A.2d 1353, 1356 (Pa. Cmwlth. 1993). The record evidence does not reflect that Claimant or her husband acted in bad faith.

4

**construed in order to effectuate its humanitarian objectives**.' *Lehigh C[nty.] Vo-Tech Sch[.] v. Workmen's Comp[.] Appeal [Bd.] (Wolfe), . . .* 652 A.2d 797, 799 ([Pa.] 1995) *citing Peterson v. Workmen's Comp[.] Appeal [Bd.] (PRN Nursing Agency), . . .* 597 A.2d 1116 ([Pa.] 1991).

*Zuback,* 892 A.2d at 46-47 (footnotes omitted). We conclude that the replacement of Van 2 is similar to the replacement of the stair glides.

Employer argues that it should have had the option to repair or replace Van 2. This argument *might* have merit if Claimant had selected Van 2 or, at a minimum, participated in its selection; however, she did not. Employer purchased Van 2 without Claimant's input or approval, and it was not sufficient to meet Claimant's medical needs from the outset. Claimant's husband testified:

> Q. [Claimant's Counsel] Now, did you participate at all in the purchasing of [Van 2]? I'm not meaning financially, but as far as you or [Claimant] participating in picking one out, or did you participate at all?
>
> A. [Claimant's husband] No.
>
> Q. When they eventually located one they were going to purchase, were you provided with any information as to whether or -- not this suited your needs or this was one that you wanted, this is one that you thought was appropriate?
>
> A. No. Not at all.
>
> . . . .
>
> Q. The year of the car, . . . was what year?
>
> A. 2001.
>
> Q. Van number one, that you were having the problems with that you got rid of, what year was that?
>
> A. 2003.
>
> Q. Van number one was a 2003 with how many miles at the time that you got rid of it?
>
> A. Somewhere between 45 and 60,000 miles.

5

Q. [Van 2] is a 2001, when it showed up at your house had how many miles on it?

A. Close to 90,000, 89,760.

Q. One of the issues that we discussed so far in your testimony was a replacement van having enough space in it to take care of [Claimant's] medical needs, that is incontinence when you're away from home. **Does** [**Van 2**] **suit those needs?**

A. **Absolutely not**.

Q. Why not?

A. Because the way the van was situated is when she got into the van there was another seat to the left of her. There were two bucket seats in behind her. So there was just one space for her to get in there and that was it.

Q. So let's make it clear on the record, how many rows of seats does this van have?

A. Three, counting the driver's area.

Q. Correct. And were they all bucket seats, or any of them a bench?

A. They were all bucket seats.

. . . .

Q. Aside from the space issue, **did you have any other concerns about** [**Van 2**] **when it was delivered to your house on that day in January**?

A. **Yes, I did**.

Q. What were those concerns?

A. When the doors in the van would close, **there was a gap between the door and the floor. Had** [**Claimant**] **moved her wheelchair while she was in the van, the wheels would go down that gap and would tip the wheelchair over**.

. . . .

6

Q. How would you secure the wheelchair in [Van 2]?

A. I would tie it down to the floor, but I would have to crawl around to hook her up. That's the only way I could do it.

Q. When you say tie down, sir, something like a strap?

A. Yes. A strap would wrap around and you would tighten it up.

Q. Like a belt?

A. Yeah.

Q. We had talked about problems that van number one had with the lift, **what about [Van 2]? How was that lift?**

A. I didn't really look at the capacity on it, but when the lift came up with her on the wheelchair, it didn't come all the way up to the floor level or anything. **There was a gap between her and the wheelchair and the floor level**. As she would come off of the lift onto the van floor, then it [sic] raise up even with the van floor.

. . . .

Q. Just so we're clear, what was the problem when the lift would go up and become close to where the floor was?

A. It wouldn't go all the way up. There was a small gap in between there, and once she would roll off of it onto the floor, as the wheelchair went on, the only way it would come up even with the floor, [sic] and then she could finish rolling off of it.

Q. So as the weight of the wheelchair would transfer to the van, the platform would then raise even more?

A. Yes.

Q. As far as the mechanics of the vehicle, on the day that you received it, were there any issues with the mechanics? Did you start it, did you see how the engine sounded?

A. Yeah. I started it. I took it for a ride. When I started it, there was a problem with starting it. I let that be known that --there was an issue with it starting right away.

Q. When you say there was a problem with starting it, explain what you mean by that.

A. When you turn a key on a normal vehicle, when you turn the key it will start cranking. When you start this one, when you turn the key it would be like a second or two hesitation before it would start to crank over.

Q. Did it start?

A. It did. It did eventually. I had problems starting it. Finally, we did get it started.

. . . .

Q. So after it was delivered that day, did you start to use it?

A. Yeah.

Q. Did you continue to experience the delay in turning the key with the starting of the van?

A. Yes, I did.

Q. Again, though, did the van start up?

A. Yes.

. . . .

Q. Were you out and about with [Claimant] at any point?

A. Yes, I was.

Q. Well, explain to us what happened?

A. We would go to Lowe's in Belle Vernon and we went into the store and were shopping, and when we came out to get into the van, I already had her up and the van wouldn't start. So even though I was having other problems with this van starting, I carried a little portable power pack with me. After doing everything I need[ed] to try to get this van started, I couldn't get it started. I used the portable power pack to jump it to get it started. And once I got it started, I

8

took her home and I immediately went to Advance Auto Parts and purchased a brand new battery.

. . . .

Q. So aside with the starting issues we discussed, the battery, the space issues, any other problems with [Van 2]?

A. It had some water leaks. I had a hard time getting underneath the van to really find out where they were coming from because I had oil in my driveway.

Q. The van was, according to your testimony, delivered in mid[-]January 2013, the battery that you purchased was March 1, 2013, so approximately six weeks later. After that point, what did you do?

A. After that point, the van seemed to be okay for two days. The third day we went out, I needed to get her to the doctor's, I went out to start the van, it wouldn't start. I had a battery charger in my garage. I hooked the battery charger up to it, it started right up. Just to satisfy my curiosity, I left it run for a little while, shut it off, tried to restart it, it wouldn't start. So I had to hook the battery charger up to it again, and it would start up. I took her to the doctor's, and let the van run the whole time we were there. When we came back home, I called this Mobility Works and told them I needed a van.

Q. Did you purchase a new van?

A. Yes.

R.R. at 58a-69a (emphasis added).

Thus, given the fact that Van 2 was not reliable, in addition to it not meeting Claimant's medical needs, it was reasonable for Claimant to purchase Van 3 rather than repair Van 2. Accordingly, while we agree with the WCJ that it may have been better if Claimant had contacted Employer before purchasing Van 3, we discern no error in the WCJ's conclusion that Claimant's failure to do so did not negate that "Claimant ha[d] met her burden of proving that Van []3 was reasonable, necessary, and causally related to the work injury and that [Employer] should be responsible for

9

paying for [Van 3]." WCJ Dec. at 10. This conclusion is especially true here where, Claimant's frustration was understandable, in that Employer selected Van 2 without Claimant's input and as the WCJ observed, "in not having a reliable vehicle [as well as] . . . the[] desire to avoid the red tape and delays, including possible litigation, which [Claimant] would have had to go through if [she] attempted to obtain [Van 3] through [Employer]." *Id.* at 11.

Employer next contends that the Board and the WCJ erred by finding that Claimant was entitled to a new van because the Claimant's lifestyle was such that she and her husband purchased used vehicles. We disagree.

We recognize:

> The Act is remedial, but it does not authorize windfalls. . . . **[T]he extent of an employer's liability may and should vary depending on the particular circumstances affecting the claimant**. Nothing in the Act, for example, requires that an orthopedic appliance—the van here—be brand new. In addition, **the claimant's prior lifestyle and resources *may* be relevant** in fixing the appropriate expense owed by the employer to secure an appropriate vehicle. Thus, the circumstances of a claimant who already owned a van prior to his injury will be different from the circumstances of a claimant who owned a smaller vehicle not suitable for wheelchair-accessible modification (but perhaps suitable for trading-in to offset the cost of a van), or a claimant who owned no car at all, but relied upon walking, public transportation or other means of travel. . . . [W]hile recognizing that a modified van is a necessary appliance or apparatus for some claimants, [we] concomitantly recognize[] that the particular circumstances of the claimant must be considered in determining the precise obligation of the employer.

*Griffiths,* 943 A.2d at 257 (bold and italic emphasis added).

With respect to the purchase of the first van, Claimant's husband related:

Q. At the time that you purchased van number one, did you have any idea of the permanency of the paralysis that [Claimant] had at that time?

A. To the best of my knowledge, we were under the assumption that her paralysis was going to be more of a temporary than permanent [sic].

Q. So what were your thoughts or the circumstances in buying van number one?

A. I had to have a van to be able to take her out from the rehab unit at Mercy Hospital, and **my thought was just to buy the cheapest van I could find to do the job at the time. So that was the van that fit the bill. It was a couple thousand dollars cheaper than anything else that I could find.**

Q. Now, after you purchased the van and brought [Claimant] home, at some time thereafter, did your understanding change as to whether the paralysis would be permanent or not?

A. Yes.

Q. And what was your understanding at that time?

A. That the paralysis was a permanent thing and that we shouldn't even look at having anything more than that.

Q. Now, Claimant's Exhibit Number Two is a photocopy of a receipt. . . . [A]t the bottom there is a balance due of $913. What was this for? Were you having any issues with the first van that you had purchased?

A. Yes, I was. Prior to this, this van had a ramp that would come out of the floor and she could drive in and out of the van. It would work sporadically, or sometimes it would work fine, sometimes it would just go out part way, it was leading up, I guess, to where the motor went bad. My wife and my daughter-in-law were out Christmas shopping, they were down by South Hills Village and they called me that the ramp was stuck part way out, and she was in the parking lot. She couldn't get in the van, they couldn't do anything. So I went down there and I had to go to Home Depot and purchase some tools and take it apart and manually, with a

11

pair of pliers I had to bring it back in. We had a portable ramp that I could get her in the van.

. . . .

Q. Prior to this ramp having issues in December of 2011, which was six or seven months after you had purchased the van, were you having any other problems with van number one?

A. Yeah, I had to have the air-conditioner fixed, which I spent $1,000 on that. I had to have the power steering lines repaired. I had to have the coolant lines repaired.

Q. Claimant's Number Three, is a fax from Mobility Works with an attached estimate for a new van. What were the circumstances surrounding this document being sent to my attention?

A. **When I found out the paralysis was permanent, and we started having problems with the other van, I knew I needed to get something that was more reliable because had I needed to take her to the doctor's or wherever I needed to take her, I needed to have a van to take her there. So I needed something reliable**.

Q. Claimant Four is a letter that I sent to John Earley, and on the second page I referenced some of the issues with van number one. We've already talked about the lift. I referenced fluid is leaking. Did you have issues regarding leaky fluids with van number one?

A. Yes. That's where the coolant lines were rusty and the power steering lines were rusty and I had to replace both of those.

Q. I also make a reference to the van being too small for [Claimant's] needs. What did you find that you needed as far as the size of the van or space of the interior regarding [Claimant's] needs?

A. With her being incontinent, and every time that we were out on the road where she needed to be taken care of, if we couldn't find a place to do it, there were times when we had to rent a motel room just to kind of take care of her needs.

12

> Because it was time to do it and we were away from home, too far away from home to get there.
>
> Q. Was the interior of van number one big enough to do that?
>
> A. No.

R.R. at 27a-31a (emphasis added). Thereafter, Employer purchased Van 2. As Claimant's husband testified, Van 2, another used vehicle, was older than the first van, did not meet Claimant's medical needs and was less reliable than the first van. *See* R.R. at 58a-69a.

Here, the record evidence shows that Claimant had originally purchased a used van at a time when she thought her paralysis was temporary and which ultimately did not meet Claimant's medical needs. Thereafter, Employer purchased a used van which also did not meet Claimant's medical needs and was unreliable. Thus, Claimant's ultimate purchase of a new van was not an attempt to gain a windfall, but rather the only way Claimant could obtain a van that met her medical needs and provided reliable transportation. Although, Claimant's lifestyle and resources **may** be relevant in determining whether Claimant is entitled to a new van, "the particular circumstances of [C]laimant" support the WCJ's and the Board's conclusion that Claimant was entitled to a new van. *Griffiths,* 943 A.2d at 257.

Employer next argues that the WCJ erred by finding that Van 2 was unreliable when the WCJ found Employer's mechanical expert David Zigarovich (Zigarovich) credible and he testified that Van 2 was reliable. We disagree.

Zigarovich testified that Claimant had a Chevy Express van and a van such as that, on average, "could very easily with, you know, proper maintenance last 200,000 miles or more." R.R. at 328a. However, he never testified that Claimant's van, specifically Van 2, was reliable. In fact, he explained that "[n]o one asked [him]

13

to do [an overall evaluation and inspection of it]." R.R. at 326a. Thus, this testimony does not affect the WCJ's finding that Van 2 was unreliable.

Lastly, Employer asserts that the WCJ did not issue a reasoned decision because the WCJ found all of the witnesses credible despite conflicts in their testimony. Specifically, Employer contends that the WCJ's decision cannot be well-reasoned when there was irreconcilable conflict between Claimant's husband's testimony and Zigarovich's testimony regarding Van 2. We disagree.

Section 422(a) of the Act provides in relevant part:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The [WCJ] shall specify the evidence upon which the [WCJ] relies and state the reasons for accepting it in conformity with this section. **When faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence.** Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the [WCJ] must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. § 834 (emphasis added). "To constitute a reasoned decision within the meaning of Section 422(a) [of the Act], a WCJ's decision must permit adequate appellate review." *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.,* 893 A.2d 191, 194 (Pa. Cmwlth. 2006).

Here, the WCJ made the following relevant findings of fact:

> 11. I accept the testimony of all of the witnesses as credible. **I do not believe that their testimony conflicts in any significant manner**. The only dispute appears to be regarding the battery which [Claimant's husband] bought at Advanced Auto Parts. While [Claimant's husband] did

14

produce documentation which supported his assertion that he paid for a 700 CCA battery[,] I note that it would be possible that Advanced installed the incorrect battery even though [Claimant's husband] paid for a 700 CCA battery. I accept Mr. Zigarovich at his word that he removed a 500 CCA battery from Van []2. I wish to note that I am accepting the testimony of [C]laimant and [her husband] as credible based upon my personal observation of their demeanors while testifying.

12. I find that the purchase of Van []3 was reasonable, necessary, and causally related to the injury of June 22, 2005.

WCJ Dec. at 10 (emphasis added). We agree with the WCJ that there is no significant conflict in the testimony. Accordingly, because the WCJ's decision contains "findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely state[] and explain[] the rationale for [his] decision[]" and the WCJ "specif[ied] the evidence upon which the [WCJ] relie[d] and state[d] the reasons for accepting it in conformity with [Section 422(a) of the Act,]" the WCJ's decision is well-reasoned. 77 P.S. § 834.

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

15

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brownsville General Hospital, Inc.,   :
                Petitioner   :
  :
        v.               :
  :
Workers' Compensation Appeal   :
Board (Berish),               :     No. 1496 C.D. 2016
           Respondent   :

## O R D E R

AND NOW, this 23rd day of May, 2017, the Workers' Compensation Appeal Board's August 17, 2016 order is affirmed.

_____
ANNE E. COVEY, Judge